IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF A
BLACK ANDROID ASSIGNED
TELEPHONE NUMBER (978) 828-4247,
AND A ROSE APPLE IPHONE ASSIGNED
TELPHONE NUMBER (508) 982-5736
CURRENTLY LOCATED AT 324 SOUTH
RIVER ROAD, BEDFORD NEW
HAMPSHIRE

Case No. 21-mj- 76-01-AJ

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jeffrey Commander, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—two electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

3.      I have been employed as a Special Agent with the Drug Enforcement Administration ("DEA") since 2005.  Upon joining the DEA, I received specialized narcotics training at the DEA training academy in Quantico, Virginia.  After completing my training, I was assigned to the New England Field Division of the DEA.  From January 2006 until December 2011, I was assigned to DEA Task Force 2 in Boston, Massachusetts.  In 2010, I was temporarily assigned to the Department of Justice Major Crimes Task Force in Baghdad, Iraq, for a period of four months.

From November 2011 until December 2014, I was assigned overseas to the DEA Dubai Country Office located in the United Arab Emirates.  In December 2014, I was assigned to the Portsmouth, New Hampshire Post of Duty for approximately one year, whereupon I was reassigned to Manchester, New Hampshire Division Office of the DEA. My duties and responsibilities include the investigation of federal crimes, including violations of the Controlled Substances Act.

4.      Through my training, education, and experience, I have become generally familiar with the manner in which drug trafficking organizations ("DTOs") conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement.  I have participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, executing arrests, and participating in court-authorized Title III wiretaps of cellular phones.

5.      I have participated in multiple Title III investigations in the Northeastern United States. I have been the affiant on Title III applications as well.  I have also been involved in a state wiretap investigation in New Hampshire.

2

6.      I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other DEA Agents, Task Force Officers, and members of law enforcement.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.      The property to be searched is a black T-Mobile Android phone assigned telephone number (978) 828-4247, and a rose-colored iPhone, unknown model, with telephone number (508) 982-5736, hereinafter the "Devices."  The Devices are currently located at South River Road, Bedford, New Hampshire in the DEA non-drug evidence vault.

8.      The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9.      Based upon information obtained from a variety of sources, including confidential sources, GPS tracking devices, cell phone location information, physical surveillance, intercepted communications, and controlled purchases of drugs, I believe that Manuel Emilio Delacruz-Diaz ("DELACRUZ-DIAZ"), Danaury Espinal-Lara ("ESPINAL-LARA"), Francisco Valdez-Aybar, Santo Luis Araujo-Guerrero, Mikael Canario-Batista ("MIKEY"), Victor Tejada-Gonzalez, Edwin Flores ("PAPO"), Ramon Jacquez-Diaz ("MACHETE"), Carlos Patricio Ozuna Gonzalez ("CARLITO"), Ambiory Monegro-Reynoso ("AMBIORY"), Wandy Rosario ("ROSARIO"), Vivian LNU ("VIVIAN"), Estiviz Estepan-Ortiz, Maribel Benjamin, and others were actively involved in the distribution of  substantial quantities of fentanyl in Massachusetts and New Hampshire. A law enforcement investigation that began in the summer of 2019 has led me to

determine that these individuals are members of an organization that I have labeled the "DELACRUZ DTO." These individuals were indicted by federal grand jury on March 8, 2021, with one count of Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 846, 841(a), and (b)(1)(A)(vi).

10.     On March 9, 2021, United States Magistrate Judge Donald Cabell authorized a search warrant for 344 Lowell Street, First-Floor apartment, Lawrence, Massachusetts—the residence that DELACRUZ-DIAZ was believed to be living in. Among other things, the warrant authorized the seizure and subsequent search of "Cellular telephones including the cellular telephone assigned call number (978) 828-4247 used primarily by DELACRUZ-DIAZ, the cellular telephone assigned call number (508) 982-5736 used primarily by DELACRUZ-DIAZ, and any other cellular phones in the residence used by DELACRUZ-DIAZ from 2020 to the present." The two specifically identified cellular telephones from the warrant are the Devices. When agents executed the warrant on March 10, 2021, DELACRUZ-DIAZ was not present at 344 Lowell Street, but rather had spent the night in Winthrop, Massachusetts with a female acquaintance. Agents arrested DELACRUZ-DIAZ at the address in Winthrop and seized the Devices incident to arrest.

11.     During the course of this investigation, five Title III applications were made to and granted by District Court Judge Paul J. Barbadoro in the District of New Hampshire, to intercept electronic and wire communications over ten different cellular telephones. Among the phones which agents received authorization to intercept were (978) 828-4247 ("TT-6") and (508) 982-5736 ("TT-8"), which are the Devices, both cellular phones utilized by DELACRUZ-DIAZ.

12.     DELACRUZ-DIAZ was first identified as a drug trafficker during a July 2018 Delaware State Police ("DSP") investigation. On July 18, 2018, DSP set up a controlled purchase of one kilogram of heroin by calling (914) 310-6127. This phone is a third number

used by DELACRUZ-DIAZ, has been intercepted during court authorized Title III intercepts, and was seized during the search of 344 Lowell Street.  DSP ultimately interdicted a kilogram of heroin on July 22, 2018, but the runners who were dispatched to deliver the drugs were uncooperative and ultimately DELACRUZ-DIAZ was not charged in that investigation.

13.     Throughout the interceptions of the Devices, DELACRUZ-DIAZ was intercepted discussing drug related activity and arranging the purchase and distribution of drugs on a daily basis over both telephones.  For example, on October 26, 2020, at approximately 8:22 p.m., DELACRUZ-DIAZ received a call on TT-6 from co-defendant VALDEZ-AYBAR.[1]  VALDEZ-AYBAR asked DELACRUZ-DIAZ, "do you have a[n]y of the whi[t]e around?" and clarified, "from the one you gave me, do you have any?"  DELACRUZ-DIAZ then clarified that VALDEZ-AYBAR was seeking "the down one," which I believe to be a reference to fentanyl, since I know from training and experience that the fentanyl is often called "down" because of its sedating effect.  VALDEZ-AYBAR then asked for "100," which I believe to be 100 grams of fentanyl.

14.     DELACRUZ-DIAZ directed VALDEZ-AYBAR to "the chicken place," which I know refers to Jacqueline's Mini-Market, which is a business adjacent to DELACRUZ-DIAZ's 344 Lowell Street residence. At 8:27 p.m., DELACRUZ-DIAZ called VALDEZ-AYBAR and told him to hurry up, and VALDEZ-AYBAR responded that he was "waiting for the taxi already." At 8:30 p.m., VALDEZ-AYBAR called DELACRUZ-DIAZ again and changed the order to "110."  At 8:35 p.m., a DEA Task Force Office observed VALDEZ-AYBAR exit the front door of 7 William Street and get into a taxi with a lighted taxi sign on top of the vehicle.

---

[1] VALDEZ-AYBAR was the target of two Title III interception orders in this investigation and was confirmed to be trafficking in fentanyl.  VALDEZ-AYBAR was the source of fentanyl for co-defendant ARAUJO-GUERRERO and sourced his own fentanyl from DELACRUZ-DIAZ.

DELACRUZ-DIAZ followed up with two more calls, using TT-6, asking where VALDEZ-AYBAR was and to hurry up.  At approximately 8:42 p.m., agents saw a gray Ford Explorer pull up in front of the Lowell Street Residence and a taxi with a lighted taxi sign drive past the Explorer. DELACRUZ-DIAZ got out of the Explorer, walked across Lowell Street and then returned to the driver's seat of the Explorer.  VALDEZ-AYBAR walked up to the passenger door of the Explorer and leaned in.  He appeared to speak to someone in the Explorer briefly before the Explorer drove off.  Agents later observed VALDEZ-AYBAR return to 7 William Street and observed that he was wearing the same clothing as the man who had met with DELACRUZ-DIAZ on Lowell Street.  Based upon these intercepts and surveillance, I believe that VALDEZ-AYBAR ordered 110 grams of fentanyl from DELACRUZ-DIAZ by calling TT-6, and completed the transaction in front of DELACRUZ-DIAZ's Lowell Street Residence.

15.     On December 1, 2020, at approximately 4:49 p.m, DELACRUZ-DIAZ received a call on TT-8 from VIVAN. During this call they had the following exchange:

| DELACRUZ-DIAZ: | Tell me love. |
| VIVIAN: | Bring me 60. |
| DELACRUZ-DIAZ: | 60? |
| VIVIAN: | Yes. |
| DELACRUZ-DIAZ: | Alright. To your house? |
| VIVIAN: | Yes. |
| DELACRUZ-DIAZ: | Alright. |
| VIVIAN: | Bring it here, I am not going to go out. 60 of the same one. |
| DELACRUZ-DIAZ: | Yes, you know it. |
| VIVIAN | Okay. |
| DELACRUZ-DIAZ: | Alright. |

16.     At approximately 5:02 p.m., DELACRUZ-DIAZ placed a call to VIVIAN using TT-8 and told her that he was heading to her house. At this time, a court-ordered GPS tracking

device on DELACRUZ-DIAZ's Jeep Cherokee showed that was arriving at his house at 344 Lowell Street, Lawrence, Massachusetts. Agents observed, via fixed camera surveillance, the Cherokee pull into the driveway of 344 Lowell Street and park.

17.    At approximately 5:12 p.m., DELACRUZ-DIAZ backed out of his driveway in the Cherokee and headed eastbound on Lowell Street. At approximately 5:15 p.m., DELACRUZ-DIAZ called VIVIAN and told her, "I am here." VIVIAN then affirmed and said that someone was coming to him.  At approximately 5:16 p.m., the Cherokee GPS stopped in the area of 37 Alma Street. DELACRUZ-DIAZ was there for approximately two minutes and then departed.

18.    Based on this aforementioned call, I believe that DELACRUZ-DIAZ received an order for 60 grams of fentanyl from co-defendant VIVIAN, a female retail drug trafficker. Based on calls during the interception period, and statements made by DELACRUZ-DIAZ following his arrest, I believe that DELACRUZ-DIAZ supplied VIVIAN with drugs. I believe that DELACRUZ-DIAZ took the drugs from his house at 344 Lowell Street and brought them to the area of 37 Alma Street, Lawrence where VIVIAN resides. I believe that VIVIAN then sent an unknown person outside to get the drugs from DELACRUZ-DIAZ and then bring them back to her.

19.    On December 18, 2020, co-defendant CARLITO arranged to purchase drugs from DELACRUZ-DIAZ.  At 3:52 p.m., CARLITO called DELACRUZ-DIAZ on TT-6 and told DELACRUZ-DIAZ, "Manny, tell him to do it the quickest he can because I have this guy on top of me."  He emphasized, "Hurry Manny, hurry!"  CARLITO continued to call DELACRUZ-DIAZ on TT-6 and complain that he was waiting and that his customer was getting impatient. Eventually, DELACRUZ-DIAZ met up with co-defendant MIKEY at MIKEY's residence at 570

Haverhill Street and obtained 50 grams of fentanyl as a sample.  At 11:38 p.m., DELACRUZ-DIAZ called CARLITO and had the following conversation:

| | |
|---|---|
| DELACRUZ-DIAZ: | Everything ready? You made it? |
| CARLITO: | Of course? |
| DELACRUZ-DIAZ: | How did you do it? Just to know |
| CARLITO: | 20 |
| DELACRUZ-DIAZ: | Did you do your calculations correctly? |
| CARLITO: | 50 plus 20, totals 70 |
| DELACRUZ-DIAZ: | Yeah. What time tomorrow will you be getting an answer for that? |
| CARLITO: | I will call you when they call me. Don't start. |

20.     I believe that DELACRUZ-DIAZ was asking CARLITO how he mixed or "cut" his drugs for testing by his customer, and CARLITO made reference to the 50 grams of fentanyl that DELACRUZ-DIAZ had obtained from MIKEY.  CARLITO indicated that he added 20 grams of cutting agent to the 50 grams of fentanyl to make 70 total grams.  DELACRUZ-DIAZ asked when CARLITO would hear about whether the drugs tested well, and CARLITO told him that he would let him know when his customer told him.

21.     The next day, CARLITO and DELACRUZ-DIAZ arranged to purchase a larger quantity of fentanyl from MIKEY, and through intercepted calls and surveillance, agents learned that the men drove to MIKEY's residence, DELACRUZ-DIAZ went inside briefly and came back out, and then the men drove back to the area of CARLITO's residence.  The following day, DELACRUZ-DIAZ and CARLITO were intercepted arguing about when CARLITO was going to pay for the drugs.

22.     On January 26, 2021, VIVIAN sent a text message to DELACRUZ-DIAZ on TT-6 that said, "They are going to want 100 of Fentanyl tomorrow."  VIVIAN clarified that she wanted the drugs to be "brown" and not cut with dilutants. She followed up with a text clarifying

8

that she wanted, "feta," which I believe was a reference to the fentanyl that she had just

specifically asked for.  In a subsequent intercepted call over TT-6, DELACRUZ-DIAZ clarified

to VIVIAN that the brown drugs were "mantequilla," which I know to be a term used for heroin,

"but not Feta."  DELACRUZ-DIAZ said, "Just so you know…that's not Feta…Feta is what I

have, what I give you."

23.     On February 2, 2021, at approximately 7:59 p.m., DELACRUZ-DIAZ made an

outgoing call on TT-8 to co-defendant AMBIORY.  DELACRUZ-DIAZ and AMBIORY then

had the following conversation:

| | |
|---|---|
| **DELACRUZ-DIAZ**: | Listen, I was going to call you... Can you find out if Bobo has the original half.  That way we can sell it to the young guy. That way we can make at least 2000 pesos, so we can spend it drinking with the whores. |
| **AMBIORY**: | I'm not going to be here this week. You know it. |
| **DELACRUZ-DIAZ**: | Call him, to see if he has the half. You know that dude will pay right away, the one from New York. |
| **AMBIORY**: | Did you work on getting me the thing? |
| **DELACRUZ-DIAZ**: | Yes. I will get you the money on Thursday. I have 1000 for Thursday and I will get you the other 1000. No worries. |
| **AMBIORY**: | Okay. |
| **DELACRUZ-DIAZ**: | Call right now, so we can get on it. |

24.     Based on this conversation, I believe that DELACRUZ-DIAZ asked AMBIORY

to see if a person referred to as "Bobo" still had the "original half," which I believe to be a half-

kilogram of undiluted fentanyl.  During a post-arrest interview, AMBIORY told agents that

"Bobo" was one of his fentanyl suppliers.  DELACRUZ-DIAZ told AMBIORY that they could

sell the half kilogram to "the young guy," and make "at least 2000 pesos."  Based on this, I

believe that DELACRUZ-DIAZ was telling AMBIORY that they could make "at least 2000

pesos" from serving as a middle-man for a deal with a customer that they refer to as the "young guy." AMBIORY told DELACRUZ-DIAZ that he was not going to be around and asked if DELACRUZ-DIAZ had worked on "getting me the thing." DELACRUZ-DIAZ responded to AMBIORY that he would pay him $2,000, which I believe is drug debt owed by DELACRUZ-DIAZ to AMBIORY.

25.     During this investigation agents also obtained multiple pen register trap and trace orders for WhatsApp accounts linked to the phones used by DELACRUZ-DIAZ, including TT-6 and TT-8. The pen register data shows that DELACRUZ-DIAZ communicated extensively with the co-defendants in this case and sent numerous image files and voice notes over WhatsApp, in addition to text messages.

26.     DELACRUZ-DIAZ was arrested on March 10, 2021 at 419 Revere Street in Winthrop, Massachusetts. The Devices were seized incident to arrest. During the search of 344 Lowell Street, agents seized approximately 2 kilograms of suspected fentanyl under DELACRUZ-DIAZ's bed. During post-arrest statements, DELACRUZ-DIAZ admitted to agents that he moves approximately 2 kilograms of fentanyl every 15 days and has been doing so for the last couple of years. The defendant provided agents with the passcodes to the devices.

27.     Based upon my training and experience, I know that drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities. Evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from many cell phones. In

addition, members of this drug trafficking organization frequently discussed communicating with each other over social media platforms, including some that are encrypted and therefore difficult for law enforcement to intercept (e.g., WhatsApp). During intercepted calls, members of this DTO discussed communicating with each other over WhatsApp, and Facebook. I know, based on my training and experience, that drug traffickers may use these platforms to communicate with people in other countries (often countries from where drugs are brought into the United States) and with people who are most cautious about law enforcement detection.

28.     In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones.  Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking.  Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case, such as this, where investigators have analyzed telephone toll records involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events. In addition, in a wiretap investigation such as this, possession of a telephone that has been intercepted discussing DTO business can be evidence of the involvement of the person who possesses it.

29.     Based on the facts set forth in this affidavit, I submit that there is probable cause to believe, and I do believe, that violation of 21 U.S.C. §§ 846 and 841 (conspiracy to distribute and possess with intent to distribute controlled substances) have been committed by DELACRUZ-DIAZ and others known and unknown.  I submit that there is probable cause to believe, and I do believe, that the information described in Attachment B will constitute evidence of these criminal violations.

30.     The Devices are currently in the lawful possession of the DEA.  The Devices came into the DEA's possession in the following way: Two cellular phones were seized incident to arrest when DELACRUZ-DIAZ when agents executed an arrest warrant on him on March 10, 2021.  Agents had previously obtained a warrant to seize and search the Devices pursuant to a search warrant for 344 Lowell Street.  Because the Devices were seized incident to arrest at a different location than 344 Lowell Street, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

31.     The Devices are currently in storage at 324 South River Road, Bedford, New Hampshire.  In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as it was when the Devices first came into the possession of the DEA.

## TECHNICAL TERMS

32.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I use the following technical terms to convey the following meanings:

    a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless

telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital

data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This

removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

    f.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

33.    Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and to access the internet.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, evidence of communications between the users and others, and location information, and other data that may be evidence of conspiracy to distribute and possess with intent to distribute controlled substances.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

35.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

36.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

37.  *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

38.      I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Devices described in Attachment A to seek the items

described in Attachment B.

I declare that the foregoing I true and correct.


/s/ Jeffrey Commander
Jeffrey Commander, Special Agent
U.S.  Drug Enforcement Administration



Subscribed and sworn to before me   Via telephonic conference
on March 22, 2021:

_____
UNITED STATES MAGISTRATE JUDGE

18

**ATTACHMENT A**

The property to be searched is a black T-Mobile Android phone assigned telephone number (978) 828-4247, and a rose-colored iPhone, unknown model, with telephone number (508) 982-5736, hereinafter the "Devices."  The Devices are currently located at South River Road, Bedford, New Hampshire in the DEA non-drug evidence vault.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.    All records on the Devices described in Attachment A that relate to violations of

**21 U.S.C. §§ 841 and 846,** and involve **Manuel Emilio DELACRUZ-DIAZ** since **July 18,**

**2018**, including:

    a.  Information associated with drug trafficking, including pay-owe sheets, buyer

        lists, telephone lists, address books, seller lists, ledgers, records of sales, records

        of expenditures made to purchase controlled substances, and records of

        expenditures to purchase products which are used in the distribution of controlled

        substances

    b.  lists of customers and related identifying information;

    c.  types, amounts, and prices of drugs trafficked as well as dates, places, and

        amounts of specific transactions;

    d.  any information related to sources of drugs (including names, addresses, phone

        numbers, or any other identifying information);

    e.  any information recording **Manuel Emilio DELACRUZ-DIAZ** schedule or

        travel from **July 18, 2018** to the present;

    f.  information reflecting contact or communication with coconspirators, the

        distribution of controlled substances to coconspirators, and the disposition of

        proceeds of controlled substances (including within messaging applications like

        WhatsApp, Snapchat, and Instagram stored on the phone);

    g.  all bank records, checks, credit card bills, account information, and other financial

        records.

2.     Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.